**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
The Honorable Michael E. Romero**

| | |
|---|---|
| In re:<br><br>Louis John Sullivan<br><br>Debtor. | Case No. 24-13435 MER<br><br>Chapter 13 |

**ORDER DENYING MOTION TO DISMISS
AND SUSTAINING OBJECTION TO CONFIRMATION**

    This matter comes before the Court following a two-day evidentiary hearing on confirmation of the Debtor's Corrected Amended Chapter 13 Plan ("**Plan**"), Stefani Sarvadi's objection thereto, Stefani Sarvadi's Motion to Dismiss Chapter 13 Case Pursuant to 11 U.S.C. § 1307(c) ("**Motion**"), and the Debtor's objection thereto.[1]

## BACKGROUND

    The Debtor filed the instant bankruptcy case on June 20, 2024. The Debtor listed Stefani Sarvadi ("**Sarvadi**") as a creditor with an unsecured claim in the amount of $733,250.[2] Sarvadi is the Debtor's ex-wife, the couple having filed for divorce in 2016 ("**Divorce Case**").[3] As part of the Divorce Case, the parties entered into a Separation Agreement.[4] Per the Separation Agreement, the Debtor and Sarvadi agreed the Debtor would receive their movie theater business, Yampa Holdings, LLC ("**Yampa Holdings**").[5] Because the Debtor was awarded the movie theater business, he agreed to pay Sarvadi $550,000 to equalize the division of their marital property ("**Equalization Payment**"). The Equalization Payment was memorialized in a promissory note, which is the basis of Sarvadi's claim.[6]

---

[1] ECF Nos. 38, 58, 66, & 75.

[2] ECF No. 1 at 30. Sarvadi filed a proof of claim for $783,160.

[3] Boulder County District Court, Case No. 16DR30327.

[4] Sarvadi Ex. D at 4-25, Exhibit 1 to Sarvadi Proof of Claim.

[5] ECF No. 105 at 20:18-25. Yampa Holdings was the holding company 100% owned by the Debtor. Yampa Holdings held two other entities, Sonora Entertainment Group and Sonora Cinema. Sonora Entertainment operated theaters in Colorado and Arizona while Sonora Cinema operated a theater in Texas.

[6] ECF No. 106 at 137:18-22.

1

Unfortunately, the Debtor experienced significant financial difficulties after the divorce. The once-successful movie theater business began to decline for several reasons, including the transition to streaming platforms such as Netflix and a decline in available product.[7] Finally, during the COVID-19 pandemic, Governor Polis mandated the closure of all non-essential businesses.[8] There were also ongoing issues in the Divorce Case, and the Debtor was ordered to pay more than $20,000 a month in maintenance, among other things.[9] The ongoing litigation costs and the high maintenance payments made it difficult for the Debtor to continue running the business, and the Debtor began withdrawing more money from the business to pay his domestic support obligations.[10] Eventually, the Debtor could no longer pull money from the movie theater business and began borrowing from his mother, Denise O'Brien ("**O'Brien**").[11] Eventually, the Debtor realized he could not borrow money from O'Brien on a long-term basis.[12]

To mitigate some of his expenses, the Debtor sought a modification of his monthly maintenance payments.[13] The Boulder County District Court ("**Divorce Court**") found the Debtor to be eligible for a modification and entered an order decreasing the monthly maintenance payment from $20,000 to $15,500 per month.[14] Shortly after the Divorce Court modified the maintenance payment, the Debtor filed his first bankruptcy case under Chapter 11, Subchapter V of the Bankruptcy Code.[15] Shortly after the first bankruptcy case was filed, Sarvadi sought to convert the case from a Chapter 11 to a Chapter 7. The court in the first bankruptcy case granted Sarvadi's motion and converted the Debtor's case to a Chapter 7.[16]

While in his first bankruptcy, the Debtor attempted to salvage the theater business. However, this proved difficult for various reasons, including uncertainty surrounding when movie theaters would be allowed to reopen, Hollywood studios

---

[7] ECF No. 105 at 214:6-25; 215:1-3.

[8] *Id.* at 218:9-15.

[9] *Id.* at 221:12-18.

[10] *Id.* at 221:14-18; 222:2-5, 25; 223: 1-5.

[11] *Id.* at 223:2-5.

[12] *Id.* at 223: 5-7.

[13] *Id.* at 224:25; 225: 2-5.

[14] Debtor's Ex. 25, March 12, 2020, Order Re: Motion to Modify Child Support and Spousal Maintenance and Objection to Special Master's Report.

[15] Bankr. Case No. 20-11876-EEB.

[16] Debtor's Ex. 11, March 30, 2021, Order Denying Confirmation and Converting Case to Chapter 7 in Bankr. Case No. 20-11876.

pulling product, and the Debtor's inability to obtain a PPP loan due to his bankruptcy filing.[17] Eventually, Yampa Holdings had no choice but to file for bankruptcy in August of 2020.[18] After the theater business shut down, the Debtor was unemployed and had no income aside from federal and state unemployment benefits.[19] In November of 2020, the Debtor started working for Trinity United Methodist Church ("**Trinity**").[20] While the Debtor was earning $90,000 per year from his job with Trinity, this was a far cry from the $570,000 he earned per year as the owner of Yampa Holdings.[21] As such, the Debtor could not afford the $15,500 monthly maintenance payment, and he requested another modification.[22] On April 29, 2021, the Divorce Court further reduced the maintenance payment to $14.00 per month.[23]

Sarvadi was understandably upset by the significant reduction in the Debtor's maintenance payments. Not only were the payments dramatically reduced, but the Debtor also was not making the required monthly payments on the Equalization Payment and appeared to be enjoying the same high quality of life he was accustomed to, while Sarvadi was forced to move into a duplex with her parents. Despite his seemingly extravagant lifestyle, the Debtor could not make the $20,000 monthly payments towards the Equalization Payment.[24] As a result, the Debtor and Sarvadi returned to the Divorce Court to address the Equalization Payment. However, the Divorce Court found it did not have jurisdiction to modify the Equalization Payment and informed the parties any modification would need to be made outside of the Divorce Court.[25] The litigation surrounding the Equalization Payment resulted in additional costs the Debtor could not afford.[26] Further, the Debtor experienced significant medical

---

[17] ECF No. 105 at 226:2-15.

[18] Bankr. Case No. 20-15310-EEB. Sonora Entertainment Group, LLC also filed for bankruptcy in 2020 under Case No. 20-15308-EEB. Both Yampa Holdings and Sonora Entertainment Group filed under Chapter 7 of the Bankruptcy Code.

[19] *Id.* at 227:7-12.

[20] *Id.* at 34:22-25; 35:1-6; 60:22-25; 61:1-4; 227:13-25.

[21] Debtor's Ex. 26, April 29, 2021, Order Re: Motion to Modify Maintenance and Child Support, at 4-5.

[22] ECF No. 105 at 228:2-24.

[23] Debtor's Ex. 26 at 7. The Debtor's child support payments were also reduced.

[24] The $20,000 monthly payments towards the Equalization Payment are separate from the $20,000 monthly maintenance payments the Debtor was originally paying Sarvadi. The monthly payments on the Equalization Payment were set to begin after the Debtor's maintenance obligations ended in 2023. Indeed, it appears the $20,000 monthly Equalization Payments were intended to replace the $20,000 monthly maintenance payments.

[25] ECF No. 111 at 5.

[26] ECF No. 105 at 230:10-15.

issues, was unable to pay his taxes, and was faced with a foreclosure on his home.[27] The need to modify the Equalization Payment, as well as the additional expenses the Debtor faced, resulted in the instant bankruptcy case.

Sarvadi asserts the Debtor's case should be dismissed, or that the Plan should not be confirmed because the Debtor did not file this case or his Plan in good faith, and because the Debtor did not accurately disclose his assets and expenses. In particular, Sarvadi asserts, among other things, the Debtor failed to disclose several income sources while including expenses he cannot substantiate, failed to disclose a bank account, and obtained a "low-ball" appraisal of his home to meet the best interest of creditors test. The Debtor disagrees with Sarvadi's analysis of the Plan and his case. He contends Sarvadi simply cannot accept the reality of his financial situation and continues to litigate the same issues across this Court and the Divorce Court. As such, the Debtor asserts he filed this case and his Plan in good faith, and that his Plan should be confirmed as is.

## ANALYSIS

### A.   Motion to Dismiss

Pursuant to § 1307(c), the Court, after notice and hearing, may convert or dismiss a Chapter 13 case for cause.[28] The causes expressly enumerated in § 1307(c) are not exclusive.[29] The Court may convert or dismiss a Chapter 13 case for causes not set forth in the statutory text.[30] A debtor's lack of good faith in filing its bankruptcy petition may serve as a cause for dismissal.[31] When determining whether a Chapter 13 petition has been filed in bad faith, the Court may consider the following factors, including:

> (1) the nature of the debt, including the question of whether the debt would be nondischargeable in a Chapter 7; (2) the timing of the petition; (3) how the debt arose; (4) the debtor's motives in filing the petition; (5) how the debtor's actions affected creditors; (6) the debtor's treatment of creditors

---

[27] *Id.* at 230:15-23; 231:1-8.

[28] Unless otherwise stated, all references to "§" or "Section" shall refer to Title 11 of the United States Code.

[29] *In re Plese*, 661 B.R. 143, 156 (Bankr. D. Colo. 2024); *Alexander v. Hardeman (In re Alexander)*, 363 B.R. 917, 925 (10th Cir. B.A.P. 2007).

[30] *In re Plese*, 661 B.R. at 156.

[31] *Id.* at 156-57 (*citing Gier v. Farmers State Bank of Lucas, Kansas (In re Gier)*, 986 F.2d 1326, 1329-30 (10th Cir. 1993)).

before both and after the petition was filed; and (7) whether the debtor has been forthcoming with the bankruptcy court and creditors.[32]

The Court must consider the totality of the circumstances.[33] Sarvadi, as the party requesting dismissal, bears the burden of proving cause.[34]

### 1. Nature of the Debt and How the Debt Arose

The primary debt at issue here is the Equalization Payment the Debtor owes to Sarvadi. The Equalization Payment arises from the Separation Agreement between Sarvadi and the Debtor, whereby the Debtor agreed to pay Sarvadi $550,000 to equalize the distribution of their marital property after he was awarded the movie theater business in the Divorce Case.[35] Another division of this Court previously found the Equalization Payment to be a consumer debt "rooted and grounded in the equitable termination of [the Debtor's and Sarvadi's] marriage."[36]

Pursuant to § 523(a)(15), a debt to a former spouse that is not for support and that is incurred by the debtor in the course of a divorce, separation, or in connection with a separation agreement is nondischargeable in a Chapter 7 case. Because the Equalization Payment arises from the Separation Agreement and is rooted in the termination of the parties' marriage, it was not discharged in the Debtor's previous bankruptcy case, nor would it be dischargeable in any case under Chapter 7.[37]

This factor somewhat goes to Sarvadi's argument that the Debtor filed this case in a second attempt to discharge the Equalization Payment.[38] After all, debts that fall within § 523(a)(15), such as the Equalization Payment, are automatically nondischargeable in Chapter 7 cases, but can be discharged in Chapter 13 cases.[39] Based on this fact, one might infer that the Debtor filed this case under Chapter 13 to

---

[32] *In re Gier*, 986 B.R. at 1329 (*quoting In re Love*, 957 F.2d 1350, 1357 (7th Cir. 1992)).

[33] *Id.*

[34] *In re Plese*, 661 B.R. at 156.

[35] POC 2-1, Ex. 1 at § 18(c).

[36] Bankr. Case No. 20-11876-EEB, ECF No. 187.

[37] 11 U.S.C. § 523(a)(15); *In re Taylor*, 478 B.R. 419, 427 (10th Cir. BAP 2012), *aff'd* 737 F.3d 670 (10th Cir. 2013) ("Section 523(a)(15) is unambiguous that non-support obligations owed to a former spouse incurred in connection with a divorce decree or order of the court are excepted from Chapter 7 discharge.").

[38] ECF No. 38, ¶ 3.

[39] 11 U.S.C. § 1328(a)(2).

5

obtain a more favorable discharge scenario.[40] In fact, the Debtor even admits the only way to address the Equalization Payment is through this Chapter 13 case.[41] However, "the fact a debtor seeks to take advantage of the broader discharge provisions of Chapter 13 is not, in and of itself, a reflection of bad faith."[42] "The use of a Chapter 13 proceeding to discharge a debt previously held to be non-dischargeable under Chapter 7 is not *per se* grounds for dismissal under Section 1307(c) for bad faith."[43] Here, the Court finds that although the Equalization Payment would be nondischargeable in a Chapter 7, the Debtor did not file this Chapter 13 case only to discharge the Equalization Payment. The Debtor is ineligible for a Chapter 7 discharge because he received a discharge pursuant to Chapter 7 in June of 2021, and the Debtor asserts he does not have the resources to pursue a Chapter 11 case.[44] It also appears the Debtor tried, unsuccessfully, for several years to address the Equalization Payment outside of bankruptcy.[45] As such, Chapter 13 seems to be the Debtor's only option to not only address the Equalization Payment, but also to address his other debts. Therefore, the Court finds these factors weigh against dismissal.

      2.     *Timing of the Petition and Debtor's Motives*

The Debtor filed his petition on June 20, 2024.[46] This happened to be the last day a debtor could file a Chapter 13 or a Subchapter V case and take advantage of the increased debt limits that went into effect during the COVID-19 pandemic. Sarvadi asserts the fact the Debtor waited to file until the very last day to take advantage of such limits is indicative of a bad-faith filing.[47] Sarvadi doesn't expand on this argument, except to say there was no litigation between the Debtor and Sarvadi to enforce the Equalization Payment pending when he filed his petition.[48] If anything, the fact there was no litigation pending demonstrates a lack of bad faith. When courts consider the timing of a petition in the context of a bad faith filing, they often look for evidence the

---

[40] ECF No. 112 at 10.

[41] ECF No. 111.

[42] *In re Lanham*, 346 B.R. 211, 219 (Bankr. D. Colo. 2006).

[43] *Id.* (*citing Pioneer Bank v. Rasmussen*, 888 F.2d 703 (10th Cir. 1989)).

[44] 11 U.S.C. § 727(a)(8); ECF No. 113 at 9.

[45] ECF No. 105 at 233:8-15.

[46] ECF No. 1.

[47] ECF No. 38, ¶ 5(e).

[48] ECF No. 112 at 4, ¶ 19.

petition was filed to delay or frustrate the legitimate efforts of creditors to enforce their rights rather than for a legitimate bankruptcy purpose.[49]

Here, it does not appear the Debtor filed this case to frustrate Sarvadi's efforts to enforce the Equalization Payment. Indeed, it appears the Debtor filed this case for a legitimate bankruptcy purpose. It is clear from the Debtor's testimony and his schedules that he does not have the means to pay his debts, including the Equalization Payment. As is, the Equalization Payment requires the Debtor to pay Sarvadi $20,000 per month, and Sarvadi has been unreceptive to any of the Debtor's attempts to settle the payment outside of bankruptcy.[50] The Debtor's schedules show he only brings home $12,364 per month.[51] After deducting expenses, the Debtor has only $2,423.60 left over.[52] This is obviously insufficient to make the required $20,000 monthly payment, let alone to make the required payments to all creditors.

Aside from the Equalization Payment, the Debtor also testified that prior to filing this bankruptcy, he was faced with a foreclosure on his home because he had fallen behind on the mortgage payments.[53] The Debtor was also struggling to pay attorney fees as a result of the litigation with Sarvadi, as well as medical bills and back taxes.[54] The Debtor also explained he hoped to resolve matters with Sarvadi and the Equalization Payment without filing a second bankruptcy case, however, these efforts proved futile.[55] In fact, Sarvadi attempted to have the Debtor held in contempt for his failure to make the Equalization Payment.[56] While the Debtor was ultimately not held in contempt because it was found he could not pay the Equalization Payment, the costs associated with the litigation are part of the reason the Debtor filed this bankruptcy.[57] Given these reasons, the Court finds these factors weigh against dismissal.

---

[49] *In re Phoenix Piccadilly, Ltd.*, 849 F.2d 1393, 1394 (11th Cir. 1988); *In re Dami*, 172 B.R. 6, 10 (Bankr. E.D. Pa. 1994) ("where the purpose of the bankruptcy filing is to defeat state court litigation without a reorganization purpose, bad faith exists.")

[50] POC No. 2-1, Ex. 1 at § 28.

[51] ECF No. 70.

[52] ECF No. 21.

[53] ECF No. 105 at 231:5-8.

[54] *Id.* at 230:10-25; 231:1-8.

[55] *Id.* at 233:8-15.

[56] *Id.* at 233:16-18.

[57] *Id.* at 231:9-19; 233:16-21.

7

### 3.   How the Debtor's Actions Affected Creditors and Treatment of Creditors

The fifth and sixth factors require the Court to examine how the Debtor's actions affected creditors and their treatment, both pre- and post-petition.  The Court finds no evidence the Debtor's actions have negatively impacted his creditors.  The Debtor's Plan contemplates paying creditors over time with the Debtor's disposable income, and it appears creditors will receive more through the Plan than they would in a Chapter 7.[58] None of the Debtor's creditors, aside from Sarvadi, have moved to dismiss the case or otherwise claimed the Debtor's actions negatively affected them.  Further, the Chapter 13 Trustee ("**Trustee**") has not objected to the Debtor's Plan or moved to dismiss the case for bad faith.[59]  As such, the Court finds these factors weigh against dismissal.

### 4.   Whether the Debtor has Been Forthcoming with the Court and Creditors

The seventh and final factor is whether the Debtor has been forthcoming with the Court and creditors.  Sarvadi makes several allegations regarding the Debtor's veracity, including that he has not disclosed all of his bank accounts, and that he secretly reinvested in and restarted the movie theater business.[60]  In particular, Sarvadi asserts the Debtor's bank statements show transfers from an account called "Louis Sullivan, New York."[61]  Sarvadi contends the transfers from Louis Sullivan, New York are from a bank account the Debtor never disclosed.  The Debtor testified he only has one bank account, and that the Louis Sullivan, New York transfers were merely transactions from Venmo.[62]  The Venmo statements provided by the Debtor support the Debtor's testimony.[63]  Sarvadi didn't provide any additional evidence to refute the Debtor's testimony or the Venmo transfer statements.

Sarvadi also asserts the Debtor disguised the fact he restarted the movie theater business, and that the income he's receiving from the revived business has not been disclosed.[64]  In support of this assertion, Sarvadi contends the current owner of the movie theater business, Roberto Sanchez ("**Sanchez**"),  lacks the necessary skill set to

---

[58] The Court will further address this issue, including the valuation of the Debtor's home, in another section.

[59] The Trustee did object to a previous version of the plan, but withdrew the objection after the Debtor filed the current Plan because the Plan resolved the Trustee's objections. ECF Nos. 65 & 80. The Trustee also filed a Motion to Dismiss for failure to make plan payments on August 8, 2025, but withdrew the motion shortly after. ECF Nos. 115 & 116.

[60] ECF No. 112 at 10.

[61] ECF No. 106 at 118:1-4.

[62] *Id.* at 56:21-23; 118:20-25.

[63] Debtor's Ex. 43, Venmo Transfer Statements.

[64] ECF No. 38 at 3, ¶ 5(g); ECF No. 112 at 9-10.

8

run the business and is simply a straw owner, while the Debtor is the true owner.[65] The Court cannot agree with Sarvadi's assertion. At trial, Sanchez testified he first worked for the business as a general manager of a theater in Texas and was eventually promoted to president of Sonora Entertainment .[66] After Yampa Holdings and Sonora Entertainment filed for bankruptcy, Sanchez purchased the movie theater equipment from Wells Fargo at an auction and moved into a new building.[67] Sanchez then formed Sonora Cinemas Holding, LLC ("**Sonora Cinemas**"), a single-member limited liability company of which he is the single member and manager.[68] Sanchez hired the Debtor to do weekly updates for the theaters, schedules, film payments, and film bookings.[69] Sanchez testified the Debtor has no ownership interest in Sonora Cinemas, and that he is only an employee of the company.[70] The Court found Sanchez's testimony to be credible. The Debtor also disclosed his employment with Sonora Cinemas on his schedules.[71] After considering the admitted evidence, the Court does not believe the Debtor restarted the movie theater business, nor does the Court believe the Debtor is hiding income from Sonora Cinemas.

Given the Debtor's and Sanchez's testimony regarding the Debtor's bank account and employment with Sonora Cinemas, the Court believes the Debtor has been forthcoming with the Court. As such, this factor weighs against dismissal. Taking this factor into account with the other factors already discussed, the Court finds Sarvadi has not met her burden to show the Debtor's case should be dismissed pursuant to § 1307(c).

## B.     Objection to Confirmation

Sarvadi also contends the Debtor's Plan cannot be confirmed because it does not account for all his income and overstates his expenses, creditors won't receive as much under the Plan as they would in a Chapter 7 liquidation. Sarvadi also asserts the case should be dismissed because the Plan was not filed in good faith.[72]

---

[65] ECF No. 105 at 23:14-20.

[66] *Id.* at 170:3-13.

[67] *Id.* at 171:18-24; 173: 15-23.

[68] *Id.* at 174:12-25; 175:1-4; Debtor's Ex. 39, Sonora Cinemas Colorado Limited Liability Company Operating Agreement.

[69] ECF No. 105 at 177:7-11.

[70] *Id.* at 177:12-15; 178:5-11.

[71] ECF No. 70.

[72] Sarvadi also argues in her objection to confirmation of the Debtor's Plan that the case should be dismissed because the petition was not filed in good faith as required under § 1325(a)(7). The Court already addressed whether the petition was filed in good faith above and therefore will not address it again in detail here.

> Pursuant to § 1325(a), the Court shall confirm a plan if
> […]
> (3) the plan has been proposed in good faith and not by any means forbidden by law;
>
> (4) the value, as of the effective date of the plan, of property to be distributed under the plan on account of each allowed unsecured claim is not less than the amount of what would be paid on such claim if the estate of the debtor were liquidated under chapter 7 of this title on such date;
>
> . . .
>
> (7) the action of the debtor in filing the petition was in good faith . . . .[73]

If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, the court may not approve the plan unless, as of the effective date of the plan, the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim or, the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period will be applied to make payments to unsecured creditors under the plan.[74]

### 1. Value of Property to be Distributed

Sarvadi asserts the value of property to be distributed under the Plan on account of each unsecured claim is less than the amount that would be paid in a Chapter 7 liquidation. In particular, Sarvadi asserts the Debtor undervalued his residence by approximately $450,000.

The Debtor's primary asset is his home. The Debtor obtained a professional appraisal of his home from Alexander Burbridge ("**Burbridge**"). Burbridge is a certified residential appraiser with nine years of experience.[75] Based on the location and condition of the Debtor's home as well as comparable sales in the area, Burbridge valued the Debtor's home at $1,034,645.[76] Sarvadi also had the Debtor's home appraised by her own appraiser, Kristin Fleckenstein ("**Fleckenstein**"). Fleckenstein has 33 years of appraising experience with eight to ten years of experience as a certified residential appraiser.[77] When appraising the Debtor's home, Fleckenstein

---

[73] 11 U.S.C. §§ 1325(a)(3), (a)(5), & (a)(7).

[74] 11 U.S.C. § 1325(b)(1)(A)-(B).

[75] ECF No. 105 at 98:1-23.

[76] Debtor's Ex. 31, August 28, 2024, Appraisal Report of 680 Benton Lane, Erie, Colorado 80516.

[77] ECF No. 105 at 143:7-20.

considered many of the same things Burbridge did, as well as the fact the Debtor's home is considered a model home and thus has upgraded features.[78] Fleckenstein also used different comparable sales in her appraisal.[79] Ultimately, Fleckenstein valued the Debtor's home at approximately $1,485,000.[80] While the Court found both Burbridge and Fleckenstein to be knowledgeable, credible witnesses, the Court found Burbridge's appraisal to be more accurate. In particular, the Court found Burbridge's comparison of the Debtor's home to a nearby home known as 884 Rocky Ridge Circle ("**Rocky Ridge Property**") to be persuasive. The Rocky Ridge Property is an identical model to the Debtor's home and was sold only a month before Burbridge's appraisal.[81] The sale price for the Rocky Ridge Property was $1,041,000.[82] After making the relevant adjustments, Burbridge arrived at the $1,034,645 value for the Debtor's home. As such, the Court will use the Debtor's valuation in the remainder of its analysis.

In his liquidation analysis, the Debtor asserts the total value of the liens on his home is $818,488.94.[83] This value includes a $585,539 lien held by Lakeview Loan Servicing, a $130,137 lien held by O'Brien's company, DSORE, as well as a $140,179 lien also held by DSORE.[84] The Debtor also claimed the full $250,000 homestead exemption. After considering costs of sale, there would be no value left for unsecured creditors if the Debtor's home was liquidated. Given the Debtor has no other major assets, unsecured creditors, including Sarvadi, would receive little to nothing in a Chapter 7 liquidation. Meanwhile, unsecured creditors are estimated to receive more than $20,000 over the 60-month term of the Plan. Therefore, the value of the property to be distributed under the Plan is more than what would be paid in a Chapter 7 liquidation.

### 2.    Income and Expenses

Next, Sarvadi asserts the Debtor hasn't accurately stated his income or expenses because he failed to include "perks" he receives from Sonora Cinemas on his Schedule I, including meals, parking, groceries, and trading cards.[85] Sarvadi also asserts the Debtor did not list a $500 monthly payment he receives from O'Brien for her

---

[78] *Id.* at 147:20-25; 148:1-7.

[79] *Id.* at 153:1-13.

[80] *Id.* at 155: 24-25; ECF No. 66 at 1, ¶ a.

[81] ECF No. 105 at 112:17-25.

[82] Debtor's Ex. 31.

[83] ECF No. 75.

[84] POC Nos. 3-1, 4-1, & 5-1.

[85] ECF No. 112 at 6-7. Sarvadi also presents arguments regarding the income received from the alleged undisclosed bank account, which the Court previously addressed in a separate section and will not readdress in detail here.

share of rent and household expenses.[86] Further, Sarvadi alleges the Debtor included expenses on his Schedule J that are paid for by DSORE, as well as a $1,400 monthly tax payment the Debtor did not make for either the first or second quarters of 2024.[87]

It appears the Debtor did fail to include certain income sources on his schedules. While O'Brien testified she does not make a monthly rent payment to the Debtor, DSORE, pays the Debtor's internet and phone expenses.[88] O'Brien testified the monthly internet expense is approximately $280 per month, while the phone expense fluctuates between $250 to $400 per month.[89] DSORE's bank statements further support this fact, as the statements show DSORE regularly makes payments to Comcast and Verizon in the amounts to which O'Brien testified.[90] Several courts have held that payments regularly made for a debtor's benefit should be disclosed as income.[91] As such, the Debtor's schedules should be amended to include the regular monthly payments received from DSORE for the internet and phone expenses.

The Debtor also did not include the reimbursements he receives from Sonora Cinemas for expenses such as meals or parking. The Debtor asserts the reimbursements do not count as income because Sonora Cinemas is simply reimbursing the Debtor for the expenses he paid out of his own pocket while performing duties for the company. However, several courts have determined that regular employer reimbursements constitute income and should be included in a Debtor's monthly income calculation.[92] Courts have also held a debtor may claim the corresponding expense that was reimbursed so long as the expense can be confirmed by documentation.[93] Just as the Debtor did not include the reimbursements from Sonora Cinemas in his income calculation, he also did not claim the corresponding

---

[86] *Id.* at 7.

[87] *Id.*

[88] ECF No. 105 at 82:16-21.

[89] *Id.* at 83:1-3.

[90] Sarvadi Ex. AA, DSORE Wells Fargo Statements.

[91] *In re Leongas*, 628 B.R. 71, 95 (Bankr. N.D. Ill. 2021) (finding funds paid by the debtor's family's businesses for the debtor's expenses counted as income that should have been disclosed on the debtor's schedule I); *In re Bullough*, 358 B.R. 261, 281 (Bankr. N.D. Tex. 2007) (finding payments made by non-debtor entities on the debtor's behalf constitutes income a debtor should list on his SOFA); *In re Deutsch*, 529 B.R. 308, 315 (Bankr. C.D. Cal. 2015) (finding non-debtor contributions to expenses may be considered regular income where contributions have been made in the past.).

[92] *Matter of Reinhart*, 559 B.R. at 220; *In re Tinsley*, 428 B.R. 689, 692 (Bankr. W.D. Va. 2010) ("since it is inaccurate or incorrect to not claim reimbursements from employers as income, reimbursements are income for purposes of § 101(10A(A).").

[93] *In re Tinsley*, 428 B.R. at 692.

expenses.[94]  While the Debtor did not testify whether he still receives regular reimbursements from Sonora Cinemas, prior receipts and expense reports show the Debtor received reimbursements several times a month, including after he filed for bankruptcy.  As such, the Debtor's schedules will need to be amended to also include regular reimbursements the Debtor receives from Sonora Cinemas and the corresponding expenses.

While there are several income sources the Debtor failed to include on his schedules, there is one income source he should have omitted: the income he receives from gambling.  The Debtor estimates he earns approximately $300 per month from gambling and generally realizes positive income from gambling each year.[95]  While the Debtor appears to be a skilled gambler, the Court believes the very nature of gambling makes this income source too uncertain to include as part of the Debtor's Plan.  Other courts agree with the Court's sentiment.[96]  As such, the Debtor should not include his monthly gambling winnings in his calculation of monthly income or disposable income.

Regarding his expenses, the Debtor included a $100 monthly payment for telephone and/or internet services.[97]  It is unclear exactly what this expense is for, especially considering that O'Brien testified DSORE pays the Debtor's internet and phone expenses.  The Debtor seems to assert the $100 is the remaining portion of the telephone and internet expenses that DSORE does not cover.[98]  However, the Debtor's bank statements do not appear to support this assertion as there are no payments made by the Debtor to Comcast, Verizon, or any other entity that would indicate a phone, internet, or cable payment, and the Debtor offered no other testimony or evidence to otherwise substantiate the payment.[99]  Similarly, the Debtor offered no evidence to prove the $1,400 estimated monthly tax payment is reasonable.  The Debtor's only argument with regard to these expenses is that Sarvadi offered no evidence to show they are unnecessary or unreasonable.[100]  While Sarvadi did not offer evidence to show that the expenses are improper, it is the Debtor who bears the burden

---

[94] ECF Nos. 21 & 70.

[95] *Id.*; ECF No. 106 at 11:2-4.

[96] *In re Cushman*, 236 B.R. 294-95 (Bankr. W.D. Mo. 2001) ("Although Cushman has supplied the Court with some evidence that he had considerable gambling winnings in 1999 and 2000 . . . the Court believes gambling, regardless of the ability of the gambler, is inherently too uncertain a source of income to fund a Chapter 13 Plan.").

[97] ECF No. 21.

[98] ECF No. 106 at 152:17-25; 153:1-4.

[99] Sarvadi Ex. LL, Debtor's 2024 Wells Fargo Statements.

[100] ECF No. 113 at 7.

of substantiating his expenses.[101] As such, the Debtor either needs to amend his schedule J to more accurately reflect his expenses, or provide evidence to substantiate the $100 internet and phone payment and the $1,400 tax payment.

Given the inaccuracies in the Debtor's income and expenses, the Court cannot be certain all of the Debtor's disposable income is put towards the Plan as required by § 1325(b)(1)(B). Therefore, the Debtor will need to amend his schedules and file a new plan that accounts for the corrected income and expenses.

### 3. Good Faith in Proposing the Plan

Finally, Sarvadi asserts the Debtor did not file his Plan in good faith and therefore, his case should be dismissed. A determination of good faith for purposes of § 1325(a)(3) is made on a case-by-case basis, considering the totality of the circumstances.[102] While some courts still use the eleven factors set forth in *Flygare v. Boulden* to assess good faith, the Tenth Circuit has adopted a "more narrow focus" since the addition of § 1325(b).[103] Now, a bankruptcy court must consider: (1) whether the debtor has stated his debts and expenses accurately; (2) whether he has made any fraudulent misrepresentation to mislead the bankruptcy court; or (3) whether he has unfairly manipulated the Bankruptcy Code.[104]

#### a. Accuracy of Debts and Expenses.

The first factor is whether the debtor has accurately stated his debts and expenses. As the Court already discussed, there may be inaccuracies in the Debtor's expenses, including the $100 monthly internet and phone payment and the $1,400 tax payment. However, it is difficult to say whether such expenses are truly inaccurate because neither Sarvadi nor the Debtor offered evidence to either rebut the expenses or substantiate them. As for the Debtor's debts, neither Sarvadi nor any other creditor disputes the debts the Debtor scheduled, the amount scheduled, or the characterization

---

[101] *In re Edmunds*, 350 B.R. 636, 645 (Bankr. D.S.C. 2006) ("Debtors bear the burden of demonstrating expenses are actual, reasonable, and necessary expenses and therefore Debtors' expenses should be considered in light of Debtors' Schedules J and other relevant evidence.").

[102] *Anderson v. Cranmer*, 697 B.R. 1314, 1318 (10th Cir. 2012) (*citing Flygare v. Boulden*, 709 F.2d 1344, 1347 (10th Cir. 1983)).

[103] *In re Plese*, 661 B.R. at 160; *Cranmer*, 697 B.R. at 1319 n.5 ("Since *Flygare* was decided, however, the Bankruptcy Code was amended to include 11 U.S.C. 1325(b) . . . Section 1325(b)'s 'ability to pay' criteria subsumes most of the *Estus* factors and, therefore, the good faith inquiry now has a more narrow focus.").

[104] *Cranmer* B.R. at 1319 n. 5; *In re Robinson*, 987 F.2d 665, 668 n. 7 (10th Cir. 1993) ("In *In re Rasmussen* we recognized that 'relevant factors to the analysis of good faith after the 1984 amendments include 'whether the debtor has stated his debts and expenses accurately; whether he has made any fraudulent misrepresentations to mislead the bankruptcy court; or whether he has unfairly manipulated the Bankruptcy Code.'"; *In re Rasmussen* 888 F.2d 703, 704 n. 3 (10th Cir. 1989); *Education Assistance Corp. v. Zellner*, 827 F.2d 1222, 1227 (8th Cir. 1987).

of any debt. While Sarvadi originally disputed the validity of DSORE's liens on the Debtor's home, Sarvadi stated at trial that she is no longer arguing the liens are "sham liens," and instead takes issue with how the liens are to be repaid.[105] As such, while the Court cannot make a definitive ruling on the accuracy of the Debtor's expenses at this time, it does find the Debtor accurately stated his debts.

        b.        <u>Fraudulent Misrepresentations and Bankruptcy Code Manipulation.</u>

While there are inaccuracies in the Debtor's income and expenses that prevent the Court from confirming the Plan, the Court does not believe such inaccuracies rise to the level of fraudulent misrepresentations such that the Debtor's case should be dismissed. As previously stated, the Court believes the Debtor has been forthcoming and has not intentionally misled it. The Court also does not believe the Debtor manipulated the Bankruptcy Code by filing his bankruptcy case on the last day a debtor could take advantage of the increased COVID debt limits.

        c.        <u>The Petition was Filed in Good Faith.</u>

As previously discussed, the Court believes the Debtor filed his bankruptcy case in good faith. While the Debtor has made it clear the only way he can address the Equalization Payment is through a Chapter 13 plan, the Debtor's testimony and schedules show the Debtor had other legitimate reasons for filing this case.

Therefore, the Court finds the Debtor's Plan and petition were both filed in good faith, and that dismissal of the Debtor's case pursuant is unwarranted.

## CONCLUSION

For the reasons stated above, the Court ORDERS, Sarvadi's Motion to Dismiss Pursuant to § 1307(c) is DENIED. The Court

FURTHER ORDERS, Sarvadi's Objection to Confirmation of the Debtor's Plan is SUSTAINED. The Debtor shall file an amended plan and Confirmation Status Report by **November 3, 2025**.

Dated October 10, 2025        BY THE COURT:

        Michael E. Romero, Judge
        United States Bankruptcy Court

---

[105] ECF No. 105 at 68:21-25; 69:1-6. The Court finds Sarvadi's arguments regarding the proposed repayment of DSORE's liens meritless and therefore will not address them.